24305 Trejos Hermanos Sucesores S.A. v. Verizon Communications, Mr. Dupree. Thank you, Your Honor. Good morning. Tom Dupree for Verizon Communications, and may it please the Court. We are challenging the District Court's recognition of a $106 million award arising from a lawsuit in Costa Rica. The District Court fundamentally erred by holding that we were collaterally estopped from advancing our defenses to judgment recognition because those defenses had been adversely decided against us by the Costa Rican courts in the very judgment under review. That was error. Collateral estoppel does not play the same role in a judgment enforcement proceeding that it does in ordinary civil litigation. The way it works in an Article 53 proceeding is that the judgment must first be recognized and then potentially it could be given collateral estoppel effect. The District Court doesn't really say it's collateral estoppel, right? The District Court says you had a full and fair proceeding in Costa Rica and therefore I'm not going to second guess the Costa Rican court on matters of Costa Rican law because they decided those questions. Well, Judge, I think you have an argument that maybe the District Court was begging the question because, you know, you're disputing whether you got a fair proceeding. I mean, maybe there's something to that. But the court doesn't actually say, you know, I'm just, you know, you're a stop from arguing it. It just thinks the arguments don't prevail because the Costa Rican court is the final authority on Costa Rican law, right? Well, I read it differently, Your Honor. I would direct the court to SA-12 and SA-17. Those are the two points where the District Court specifically articulated this circuit's test for collateral estoppel. It's what Your Honor just stated, that you had a full and fair opportunity to litigate below. The court restated this court's test for collateral estoppel and then applied it and said we lose because we had a full and fair opportunity to litigate it below. I don't see how you could possibly read that as anything other than a collateral estoppel decision, particularly because the plaintiffs themselves urged the District Court to apply what they called well-worn principles of collateral estoppel. That's what the District Court did here. This was not, as the plaintiffs would have it, a comity-based decision to defer. For one thing, the word defer or deference doesn't appear anywhere in the District Court's opinion. For another thing, the District Court plainly did not conduct the typical… Even so, you didn't use the word defer. Isn't that what's happening here? It's deferring to the judgment of a foreign country, a court of a foreign country. Well, the plaintiffs say that… I mean, it's applying. In fact, it is applying comity. Is it not, the District Court? Well, I don't think it is, Your Honor. I think it was applying collateral estoppel. At least that's what the court said it did. It referred to, quote-unquote, ordinary principles of race judicata. As I said, it cited the collateral estoppel standard. So how would the comity inquiry look differently? So if they're doing it as a matter of comity as opposed to… If the District Court does it as a matter of comity as opposed to collateral estoppel, isn't it going to say, well, I don't see any reason to think that it was unfair proceeding that violated norms of due process, and so therefore I'm going to recognize the foreign, you know, decision on matters of Costa Rican law as a matter of comity? Well, I think there are two sources that this court can look to for what a comity analysis should look like. The first is this court's decision in the ICC chemical case where it says a comity analysis requires a thorough consideration of various factors. Maybe a more relevant analysis was the Supreme Court's decision in the animal science case. There, Justice Ginsburg, writing for unanimous court, talked about how United States courts should go about making that precise analysis. It litigated the case for 11 years in Costa Rica altogether? It was roughly that amount of time. Roughly that amount. It was a long time. It was a long time. And the issue of subject matter jurisdiction was raised and considered by the Costa Rican courts? It was, Your Honor. And the existence of subject matter jurisdiction is to be decided under Costa Rican law? Well, I'm not sure about that, Your Honor. This court said in Servo Pronto that an article— But whether the court in Costa Rica had subject matter jurisdiction is not to be decided by Costa Rican law? Is that your position? Well, our position—two things, Your Honor. First, in Servo Pronto, this court said that an Article 53 proceeding— So your position that the Costa Rican law is— the court is not to apply Costa Rican law in deciding whether it had subject matter jurisdiction? Oh, no, I agree with that, Your Honor, but for purpose— And so it applied Costa Rican law, it made a decision, it went up to the higher court, and you're now asking us to second guess whether they got Costa Rican law right? No, Your Honor. Several points. Isn't the point of comedy to provide recognition to foreign judgments? Quickly and in an expeditious manner? And Article 53 enshrines the principle of comedy by saying that these foreign judgments are presumptively enforceable, but—and this is the important point, Your Honor— we have a right to present defenses to recognition, including jurisdiction, including the arbitration provision that require— In the 11 years of litigation, you weren't able to present those defenses? But that's not our argument, Your Honor. We presented those defenses. We're not quarreling with that, Your Honor. What we are saying is that a United States district court has an obligation to conduct some sort of independent— So on the subject matter jurisdiction question, is the question whether the Costa Rican court got the subject matter jurisdiction question right as a matter of Costa Rican law, or does the CPLR, by invoking the concept of subject matter jurisdiction, mean that it's this kind of independent concept that's being applied? So what is the nature of the defense? I think the nature of the defense is whether or not— and I agree that I think Costa Rican law does inform the judgment on a judgment recognition defense. So we're not saying that that's something that's decided purely as a matter of New York law. I think the answer is different, though, with the arbitration provision. In other words, whether or not— You know, I'll get to that in a second, but I'm curious about the subject matter jurisdiction. That's different. But subject matter jurisdiction, right. I think there—what the district court here should have done is analyzed whether or not the Costa Rican courts fairly applied the law of subject matter jurisdiction to conclude that they had it. We're not saying this is a de novo— On the subject matter jurisdiction question, the Costa Rican courts seem to apply the rule that as long as you sue a government agency as a defendant, the whole case goes into the administrative court, right? That was their rationale. It seems like that's a weird rule, because it means that a plaintiff can always manufacture jurisdiction in the administrative court. But I don't know whether that's right as a matter of Costa Rican law. So the inquiry is whether the court is adhering to Costa Rican law, that really is a consistent principle in Costa Rica, or do we inquire as to whether the rule makes sense? Well, I think what the court needs to do is determine whether or not the Costa Rican court correctly applied Costa Rican law, giving deference, as Judge Chin said, to the fact that there is a determination from the nation's highest court. But there has to be some minimal independent assessment by a United States district court judge that that court did, in fact, have subject matter jurisdiction under whatever the applicable law is. So that inquiry looks like what? The district court would have to look at the facts and say, well, okay, they applied the principle that as long as there's a government defendant, you get into the administrative court. And that does not look like an outlier if I look at the body of Costa Rican law. And so, therefore, I'm satisfied that it was not, you know, an unfair proceeding. That's a fair assessment, Your Honor. And we put in – So that just sort of simple factual determination wasn't made or that simple inquiry about whether it's an outlier. That's right, Your Honor. And really that gets to our fundamental point here, is that what the court did was it determined that it was bound and obligated to follow what the Costa Rican courts decided. Okay, but there I can kind of understand the principle that the Costa Rican courts are applying, even if I say it's not obvious that it makes a whole lot of sense. I would think on the arbitration agreement, you have a kind of stronger argument, right, because the Costa Rican court is saying, well, Verizon Communications is not a party to the arbitration agreement so it can't take advantage of it. But Verizon Communications is also the alter ego of the party to the contract and, therefore, can have all the liability. And that just seems like an internal contradiction. So it's not obvious that there is a principle that's being applied. And that's exactly it, Your Honor. The issue here is that, on one hand, the Costa – Do we have an explanation for that? I mean, does the Costa – Do the Costa Rican courts explain why you can be an alter ego for the purpose of liability but not for the purpose of the rights under the contract? I'm not aware that they have a coherent explanation on that, and our legal expert who is a professor of law at the University of Costa Rica Law School explained why that is wrong, the wrong application of Costa Rican law. But that's one of the most fundamental unfair aspects of this entire proceeding. To Your Honor's point, on one hand, we were held liable for breaching a contract, the tune of $106 million, when we were not a party to the contract. Then, when we said, well, okay, if under Costa Rican law you're going to say we're a party to the contract, well, then we're entitled to invoke the arbitration provision. They said, oh, but you're not a party to the contract. Fundamentally unfair, and the district – Right, so it seems like the district court – you know, maybe sometimes the district court might say – the district court repeats over and over again, like I'm going to accept Costa Rican law even if it's different from New York law. But if the thing seems contradictory or arbitrary on its face, maybe it does need to inquire a little bit as to what the reasoning is, and at least there has to be a coherent principle, right? That's exactly right, Your Honor. There has to be a minimal amount of tire-kicking here by the district judge. That didn't happen. I'm out of my opening time. I want to reserve time for rebuttal, but the final – But then I want to ask about the damages too, right? So that kind of seems similar, right? So you can – we can recognize a foreign judgment only insofar as it's compensatory, not punitive, right? That's correct. But the damages here, the calculation involves reliance and expectation damages, right?  So the Costa Rican court awards damages for the profits that Tregos Hermanos would have received under the contract, but then also damages for the money they spent on machinery that would have allowed it to perform under the contract, right? And so that awards them the profits as if they didn't have to incur any expenses in performance, right? Yes, Your Honor. So that ends up being more than the harm they suffered. That's exactly right. This contract, if fully performed, was worth $8 million, and they were awarded $106 million. And the judge's adjunct, the expert who advised the judge, the judge's clerk in effect, literally got a cut of the award depending on how much was affirmed. So when we evaluate whether damages are compensatory or punitive, I mean, the district court says, well, the Costa Rican court didn't think it was imposing punitive damages. So how do we think about that? If the Costa Rican court didn't think it was imposing punitive damages, but we do think that the damages exceed the harm from a breach of contract, does that make it punitive? Oh, absolutely it does, Your Honor. And look, our point is that the district court was not bound to accept what the Costa Rican court said. Could they ultimately defer to some of these as a matter of comedy? Potentially they could, but that analysis did not happen here. There needed to be some modicum of independent judgment brought to bear by the United States District Court before they recognized this judgment. So what do we do with that? So if in fact it is routine in Costa Rica that you get reliance damages and expectation damages such that a breach of contract damages would be kind of a windfall to the non-breaching party, then should the district court have accepted that? No, I don't think so, Your Honor. In other words, I think that the district court's role here is to give due respect to Costa Rican law and to the proper application of Costa Rican law. But the key point is it is not, as the district court erroneously assumed, that it was bound to accept whatever the Costa Rican courts said. We're not saying it's a de novo review. We're not saying it's binding. Couldn't you think that actually the district court is right that if you have a full and fair opportunity to litigate it and the Costa Rican court applies Costa Rican law, then we should accept that? But you're sort of saying that the nature of the judgment suggests that it was not a fair opportunity, and so you can't just assume that you had that in order to defer to it, right? There has to be some determination as to whether it made sense in the first place. Yes, but the issue here, Your Honor, is that the full and fair opportunity cannot possibly be a sufficient defense to all of the judgment recognition defenses. If it were, well, then any foreign judgment would be automatically recognized. So do you agree that you had a full and fair opportunity or are you just saying that it's not sufficient? We do not think the proceedings in Costa Rica had integrity. That's the relevant test under judgment recognition. In other words, the relevant test under judgment recognition, under the newly amended Article 53, which puts a spotlight on the integrity of the individual proceedings, says if you did not have the proceedings raise a substantial doubt, substantial doubt that they lacked integrity, that is a basis for non-recognition. Here, that question was decided against us on summary judgment. There's clearly, at a minimum, a factual dispute on these issues. We were denied any discovery, any discovery on a $166 million judgment. So what would the discovery have shown? I mean, you got expert discovery, right? So you got to introduce expert reports about Costa Rican law, but what would the additional discovery have shown? We did get expert discovery. We got no fact discovery. The fact discovery that we sought was indisputably germane to our defenses. Number one, we requested any ex parte communications between the plaintiffs, their counsel, and the judges who decided this case in Costa Rica. Number two, we sought any evidence concerning why the government was, to Your Honor's point. I'm curious about that. So the thing about the communications, so you say that the initial recusal order was reversed with that explanation, but the other side suggests that there was a written explanation of 14 pages. Was there an explanation for the reversal of the recusal order? If there was, we haven't seen it, Your Honor. I know that's what they said. We haven't seen it. It wasn't in the record here, the appendix that we prepared for this court. We didn't see it. But it is indisputed that we moved to recuse the slate of judges. Our motion was granted because of these conflict issues. Then it was reversed. And, again, we haven't seen this, which raises other issues. We haven't seen this decision. But, nonetheless, the fact is that an independent Costa Rican judge determined that there were Well, you haven't seen it. I mean, you participated in the litigation, right? So you're saying that there might be some kind of a 14-page order that involved your motion that you never saw? Your Honor, all I can say is that I haven't seen it. We haven't seen it. We tried to find it. We didn't find it. I'm not disputing that the plaintiffs have that. I'm not suggesting that for a minute. Did you ask for it from the plaintiffs? So, no, not after they said that. But our point, Your Honor Is that the first time you learned of it was in their brief? Is that why you didn't ask for it earlier? That's right. But I think it's, I mean, whether or not there was a written opinion or not, I think the main point, the relevant point here, Your Honor, is that we had a determination from an independent judge in Costa Rica that there were sufficient problems Do you want a discovery on whether these judges were corrupt? Well, I wouldn't go so far as to use that word, Your Honor, because that's not the standard. That sounds a little speculative to me. But, Your Honor, with respect, I don't think it is speculative. Because, number one, we have indisputed evidence that there was a sufficiently close relationship that one of the presiding judges described their lead counsel as the father figure in her life. We had that. We had a series of events, the extraordinary jurisdictional grab by the administrative court. We had the fact that they got an $106 million award based on an $8 million contract. We had the judge's expert, who's a plaintiff's contingency fee lawyer and gets a cut of the award. We had a forest of red flags bearing directly on the integrity of this proceeding, Your Honor. It was sufficient for us to survive summary judgment. The fact discovery would go to whether there was some kind of untoward communication or partisanship based on personal relationships between the judges and the counsel. Yes. But your other arguments are legal arguments about whether Costa Rican law was fairly applied, whether the judgment makes sense, and so on. So those can be decided without additional fact discovery. And so if we think that the partiality of the judges to some of the lawyers might be dispositive, that would require additional fact discovery, right? Well, certainly the partiality, yes. We submit that the other two categories of evidence that we requested also are relevant. They are germane to the defenses that we were raising because they bear on the interpretation of the arbitration provision. They bear on the jurisdictional question about why this case was in the administrative court. And I think it's also worth noting that the discovery we requested, these three categories, are not excessively onerous or burdensome. Asking them to produce communications with the judges, if there are none, they could simply say we have none. But it is somewhat extraordinary, even in an Article 53 proceeding, not to allow any fact discovery before entering judgment on a $106 million award. At a minimum, we should have gotten some discovery. And the evidence that we did put in the record was plainly sufficient to defeat summary judgment on a factual question. Could a reasonable fact finder have found doubt? Again, the standard under Article 53 is simply doubt, substantial doubt. We don't have to prove corruption. We don't have to prove it was tainted. All we have to show is a factual dispute going to substantial doubt, Your Honor. We easily cleared that standard. If I could reserve my reign or my time for rebuttal. Thank you. Let's turn to the appellee, Ms. Zaharia. Good morning. Good morning, and may it please the Court. Amy Zaharia of Williams & Connolly for Appellee Trejos Hermanos. Verizon's position flouts the comedy principles codified in New York's Recognition Act and New York's long tradition as a generous forum for recognizing foreign judgments. And Verizon's approach lacks any precedent. Verizon cites no U.S. case that has rejected a foreign high court's ruling under its own law on subject matter jurisdiction or the existence of an arbitration agreement. Unless the Court wishes to start elsewhere, let me start with Verizon's argument that the Court did not conduct a comedy analysis. There are at least five compelling indicia in the district court's decision that it was conducting a comedy analysis. First, the district court's rule statement at SC-12 comes straight from this court's decision in ICC Chemical. Second, which is a comedy case. Second, in five separate locations in the district court's decision, it applied that rule statement. It said it was following the approach set forth in ICC Chemical. Conversely, it did not cite any collateral estoppel or race judicata cases. Third, with respect to what I think is really at the heart of- It does do basically what Mr. Dupree said. It said, well, I think you had a fair opportunity to litigate this, and therefore I'm just going to accept what the Costa Rican court said as a matter of Costa Rican law. I'm not going to inquire into whether it's an outlier for Costa Rican law. It looks like it contradicts well-established principles of Costa Rican law. It doesn't do that kind of inquiry, right? That's correct, and that was entirely appropriate given that this was a decision from the highest court of Costa Rica. It is an authoritative statement of Costa Rica law, and in that circumstance- You're saying it's actually appropriate to do something that looks like collateral estoppel. It should just accept the decision of the Costa Rican high court, right? In a situation where we have a decision from a high court, and the litigant had the opportunity to fully and fairly litigate that issue in the foreign country, assuming that none of the other grounds for recognition are satisfied, then yes, I think it is perfectly appropriate for a district court to defer to the foreign high court statement of its own subject matter jurisdiction. So whether it's a fair opportunity, that's the matter in dispute, right? So there has to be some kind of predicate determination that you did have a fair opportunity. I guess the thing that I mentioned to Mr. Dupree was I can kind of understand. Well, okay, the Costa Rican high court says, well, the administrative court has subject matter jurisdiction whenever there's a government defendant, and maybe I don't like that rule because it allows plaintiffs to manufacture jurisdiction, but it's a coherent rule. But what about the enforcement of the arbitration clause? Isn't it just a contradiction on its face to say, well, Verizon can't take advantage of the arbitration clause. It's not a party to the contract, but it has all the liability under the contract because it is an alter ego of the parties to the contract. I mean, isn't that just contradictory? What is the, like, Costa Rican principle that explains it? Sure. So let me address that, I think, in two ways. So first, I want to focus the court on the language of the relevant grounds for nonrecognition related to arbitration. As to B-5, which is the key ground, that asks whether there was a proceeding in the foreign court that was contrary to an agreement between the parties under which the dispute in question was to be determined. There simply is no agreement to arbitrate between Verizon Communications and Trejos Hermanos, who are the parties to this proceeding. Well, that's not clear, right? If, in fact, Verizon is the alter ego of Verizon Costa Rica, then there was an agreement between the parties, right? No, there is no agreement between these two parties. Verizon's argument is that it should have been permitted to invoke. Oh, but come on. I mean, the agreement is, well, either Verizon is not a party to the agreement, in which case it doesn't get the liability or the rights under the contract, or it is a party to the agreement, in which case it gets the liability and the rights. But the Costa Rican court said, well, you're a party to the agreement insofar as you get the liability, but not insofar as you get the rights. And that just is incoherent, isn't it? No. First of all, the Costa Rican courts did not hold that Verizon Communications was a party to the agreement. It extended liability under the well-established principle of Costa Rican law known as the economic interest group, which provides that when you have – That's roughly what we talk about when we talk about alter ego, like you can treat them as one entity, right? I think that it's roughly analogous. Right. So then why doesn't that work both ways? I mean, we have expert testimony that says that sometimes that is used to subject a non-party to an arbitration agreement to the arbitration agreement, right? He said the courts could have reached that conclusion, but not that they had to. I accept that Costa Rica has the economic interest group theory. I guess my question is why is it contradictory to say, well, you're not one interest group for the purpose of the arbitration clause part of the contract, but you are one interest group for the liability part of the same contract? Sure, because that is the kind of economic policy choice that U.S. courts defer to the judgment of foreign nations. It's not an economic policy question. It's about enforcement of contracts, right? No, it's a policy choice about when a non-signatory to an arbitration agreement can invoke. So you're saying that Costa Rica actually does have a principle that says if you're part of the same economic interest group as a contractual signatory, you can take advantage of any of the protections of the contract, but you do accede to all the liability. That's like what Costa Rican law says? No. And that's just a choice of Costa Rica? The court never had to reach that particular question because the courts further held that Verizon Costa Rica, which was the subsidiary, was not permitted to arbitrate the claims against it because of the presence of the government agency in the action. I don't understand that either. So why does that make sense? So initially when the first chamber rejects the application of the arbitration agreement to ICE, it says, well, ICE is in the parties arbitration agreement, which that's right, but Verizon Costa Rica is. So why does the presence of ICE as an additional defendant mean that the arbitration clause between Trejos Hermanos and Verizon Costa Rica is ineffective? Sure. Well, the court said that as a matter of Costa Rican law, when there is a case involving a government agency, that case cannot be subject to arbitration, just like under U.S. law. That's not true. I mean, in this very case, didn't ICE arbitrate its dispute with Verizon Costa Rica on the earlier contract? Like there were arbitration proceedings involving a government agency in this very case, right? But that's because the ICE-Verizon Costa Rica agreement itself had an arbitration agreement, whereas there was no arbitration agreement between Trejos Hermanos and ICE. That begs the question, right? The whole reason why Trejos Hermanos can sue ICE is because it has this contract, right? It's suing for breach of contract, right? So it's going to reach ICE through that contract. And so the question is like if you're going to say it has rights under the contract, maybe the counterparty also has rights, has protections under the contract, right? Well, what the court said is that the – Maybe the Costa Rican court concludes, okay, ICE is not a party to the arbitration agreement and ICE is also not the alter ego of the party to the arbitration agreement. Fine, but why does the presence of ICE mean that Verizon Costa Rica is not even – can't even take advantage of the arbitration agreement? Well, because just like under U.S. law, U.S. law exempts certain kinds of disputes from arbitration agreements such as agreements involving seamen or transportation workers. Under Costa Rica law, because there were claims against ICE and these proceedings, the Costa Rican courts held that they were not subject to arbitration. So you're saying the way Costa Rican law would work is that if Trejos Hermanos had sued just Verizon Costa Rica and Verizon Communications, the arbitration agreement would apply and they'd have to be arbitrated. But because they added ICE as an additional defendant, then it invalidates the arbitration agreement even though it didn't have any valid claims against ICE? I don't know what the Costa Rican courts would have done with respect to Verizon Communications because it did not have an arbitration agreement with Trejos Hermanos. But as to Verizon – You're saying the presence of ICE as a defendant just invalidates the arbitration clause? That was the reasoning of the Costa Rican courts. But I'm just asking, why does that make sense? So like I said, if in fact there's some principle of Costa Rican law that's applied and maybe I don't agree with it, I might say, okay, fine, we accept the application of foreign law. But this just seems completely arbitrary, right? Shouldn't there at least be some kind of inquiry into whether this makes sense? No, Your Honor. That is not what U.S. courts do when they are reviewing foreign judgments. They do not ask whether foreign law makes sense unless it rises to the level – Well, it's completely contradictory, right? Like whether – if it just seems like a contradiction on its face to say, well, you're close enough to the counterparty to accede to all the liability, but you're not close enough to invoke any of the rights. It just seems arbitrary, right? And we have grounds for not recognizing foreign judgments, which is when the parties have agreed that it should not be decided by a court, which here indisputably there was such an agreement. So the question is whether it's valid under Costa Rican law. The Costa Rican courts apply a principle not to accept it that seems to just kind of arbitrarily disregard the arbitration agreement. And then that ground is backed up by the idea that you also don't recognize a foreign judgment when it's contrary to public policy of the United States. And the Supreme Court says over and over again there's a strong public policy supporting the enforcement of arbitration agreements. So it just seems to me like there needs to be some explanation before I understand why this is a coherent application of foreign law and not just an arbitrary invalidation of an arbitration agreement. So I think Verizon's argument can only be a public policy argument because, again, under the text of B5, there is no agreement to arbitrate between these two parties. And so all of these arguments are public policy arguments. So you're saying you should interpret the word between in the CPLR not to allow for things like alter ego and whatever where, like, you might end up having an arbitration agreement because you're closely associated with the counterparty? Yes. Under that statute, it only applies when you're literally the name on the contract? Yes, it asks whether there is. Why shouldn't I understand statutory text in light of all the relevant background principles, which is sometimes by operation of law you accede to a contract based on alter ego and other doctrines? Because even in those U.S. cases that allow a non-signatory to invoke an arbitration agreement, they do not hold that party to be a party to the arbitration agreement. And so if I disagree with you and I say when the CPLR says it's contrary to an agreement between parties to resolve it outside of the court, I don't think between means literally only the parties. I think it means anybody who legally can be considered a party to the contract. Does that change the outcome? No, because the court still appropriately deferred to the Costa Rican High Court's decision about whether there was an agreement to arbitrate between these parties that could be enforced in Costa Rica. And on that particular point, I want to highlight, going back to my list of the five factors, that at SA-25 on this issue, the Costa Rican – excuse me, the district court said that it respects the decision of the Costa Rican courts on the issue of arbitration. That respect language is classic comedy language. So too – I'm asking this question, which is I look at this decision. It seems arbitrary to me. I'm not sure I should respect it. So I'm just sort of asking what is the principle of Costa Rican law that makes it coherent? The principle of Costa Rican law that makes it coherent is that when there are claims against a government agency and those claims are not themselves arbitrable, the Costa Rican courts have held that all claims in that proceeding are to be tried in the administrative court. And here – It's not just that it's in the administrative court. It's also tried in the administrative court without regard to an agreement to arbitrate between private parties. Yes, that is what – So it invalidates their arbitration agreement. That is what the – In the presence of a government agency as a defendant. Because it was that breach that then caused the termination of the subcontract between Verizon Costa Rica and my client, Trejos Hermanos. And so what the court said is the contract that is at issue here is not the contract between Trejos Hermanos and Verizon Costa Rica, at least not in the first instance. The first question was did Verizon commit a breach? But then they go on because they took the whole case into the administrative court to adjudicate the rights under the contract between Trejos Hermanos and Verizon Costa Rica, and it does so without regard to the arbitration agreement. Yes, correct. That's what it does. Right, and so you're saying the principle is, well, because there's a government defendant present in the case, Costa Rican law invalidates the arbitration agreement. That is what the Costa Rican high court – Okay, but we have some suggestion based on the expert declarations and based on the experience in this case with arbitration involving a government agency that it doesn't seem like Costa Rica always does do that. So shouldn't there at least be an inquiry into whether that really is a consistent application of what Costa Rica normally does or whether in this case they arbitrarily, contrary to Costa Rican law or normal practice, disregarded the arbitration agreement? No, because again, the district court appropriately deferred to the highest court in the land. Verizon points to animal science products. In that case, the Supreme Court held that when a court is construing the content of foreign law, the question of how much deference is owed to the foreign government statement of its own law depends on the source of that law. No, I guess that's right, but you do know, right? So we do have the grounds for nonrecognition if it's contrary to an agreement or contrary to a public policy United States. So if Costa Rica just declared expressly, we do not allow arbitration agreements. And so even though the party has signed one and there's nothing wrong with it and if it were a normal contract, we'd enforce it, the public policy of Costa Rica is we don't allow arbitration agreements. Would that then – and so there was no question that they just disregarded it. Would that then be a ground for nonrecognition because it would be contrary to an agreement and contrary to the public policy of the United States? Not if the agreement at issue incorporated Costa Rican law as this one did. If an agreement says this agreement shall be governed by Costa Rican law and Costa Rican law does not recognize arbitration agreements. So if parties signed a contract that said we want our disputes to be arbitrated, so they went to the trouble of writing up that arbitration agreement and they do it in Costa Rica, so I guess they choose Costa Rican law to govern it. We should understand that as them not actually agreeing to arbitrate and like it does not implicate an agreement between the parties that Costa Rica ignores that contract. It doesn't implicate the public policy that favors the enforcement of arbitration agreements. I think if Costa Rican law said we do not recognize arbitration agreements and the parties accepted application of Costa Rican law in their agreement, then yes, I think that a court would defer to that. What if in this case Costa Rica said, the Costa Rican Supreme Court said normally we do enforce arbitration agreements but we really don't like Verizon and so therefore we're not going to do it here? Well I think that would very well give rise potentially to another ground for nonrecognition such as the integrity ground or the due process ground. If the court simply refused to hear Verizon's arguments about an arbitration agreement because it didn't like Verizon, that very well could be a due process. But isn't that the argument Verizon is making? They're saying well they normally would enforce arbitration agreements and they didn't hear and it's inconsistent with the way they would normally apply Costa Rican law in these circumstances, right? So if I think the non-application of the arbitration clause just seems arbitrary and there isn't like real explanation for it, isn't it plausible that that's essentially what the Costa Rican court did in this case? No, because the relevant grounds for nonrecognition would be one, is there substantial doubt about the integrity of the proceedings and two, was there a due process violation in these proceedings? As to due process, the courts uniformly ask whether the litigant received fundamental fair procedures and the foreign court and Verizon can't even – and so therefore we won't allow them to take advantage of the benefits of the contract, right? I think I would have to agree with that but that's not what happened here. Verizon litigated this issue for I think it was 13 years total in the Costa Rican courts. It took multiple appeals. It received a 95-page written opinion from the administrative court in this case. Yeah, I know, but I mean you wouldn't say that the length of judicial opinions like it shows that it's high quality work necessarily, would you? Not necessarily, but it at least shows that the court heard Verizon's arguments. It adjudicated those arguments just like any other court in Costa Rica would. Can I ask you about the damages? Sure. So we do have under the CPLR that we only recognize an award insofar as it's compensatory, not punitive, right? Yes. So here the Costa Rican court calculates damages for – they give damages for the machinery that Treos Hermanos bought in order to perform under the contract as well as damages for the expected profits under the contract, right? Yes, Your Honor. And it gives damages for the limited cash flows that led to the shutdown. Then it also gives damages for the lost profits from the shutdown, right? So you get reliance as well as expectation, so you're really put in a position as if you could get the benefits of contract performance, but you didn't have to incur any costs in performing the contract. That puts the counterparty in a better position than if the contract had been performed, right? No, Your Honor. Let me just say a few things about the damages. So before we get to that question as to whether it does or doesn't, do you agree that if in fact the damages do more than compensate for the harm, it shouldn't be recognized insofar as it does that? No. The relevant standard is whether the award was punitive. Verizon made an argument below that as a threshold matter, this was a punitive award and therefore cannot be recognized. The district court rejected that argument and Verizon did not appeal that argument. That argument has been forfeited. Okay, fine. So whatever. Whether Verizon forfeited it or not, I take that point and I will consider that. But then just because I'm curious about the issue. Sure. So the New York courts say apparently that a penalty is any extraordinary liability to which the law subjects the wrongdoer in favor of the person wronged, not limited to the damages suffered. So if I think or if I were to conclude that here the Costa Rican court awarded damages in excess of the damages suffered, why shouldn't that be considered a penalty? Because that's not what it did. It awarded both compensatory damages for the lost cash flows under the agreement with Verizon and then it awarded what is I think the equivalent of consequential damages. And those are the damages that flowed from the fact that Verizon's willful breach put my client out of business. So I understand. So like giving them the present value of all the profits they would have gotten if they had not shut down, that's probably not something you can get in a U.S. court, but maybe Costa Rica does that. But since I'm looking for kind of internal contradictions, I guess my question is if the damages cover both the cost of performance and also give you all the profits from performance, isn't that just obviously an excess of what you would have gotten had the contract been performed? I don't think so, Your Honor, but I think the place for Verizon to have made those arguments was in Costa Rica and it didn't do that. It is quite remarkable that in the proceedings below is the first time that Verizon put forth an expert report on damages and it made these arguments. It made these double counting type arguments for the very first time. It never presented its own damages case in Costa Rica. It didn't even choose to examine. I think that's fair. It does seem like they didn't contest the damages calculation in Costa Rica and maybe they didn't appeal this argument. I'll ask Mr. Dupree about that. But just putting that aside, if they had contested it all the way through, would that be a problem that the damages calculation does more than put Trejos Hermanos in the position it would have been had the contract been performed? It awards more damages than the harm it suffered from breach and that takes it beyond compensatory damages. I think if we're quibbling about the amount of the investment and the machinery, no, Your Honor. I mean, these are all the kinds of things that I think a U.S. court would defer to a Costa Rican court as these are appropriate categories of damages. Now, of course, if the Costa Rican court just said, I'm going to give you whatever, $50 million in damages, without articulating the reason for those damages, and it was clearly not tied to any category of damages that we had requested, that would certainly, I think, raise suspicions and may rise to the level of being punitive. But that's just not what happened here. The administrative court went through 27 pages of analysis of these categories of damages. And that's where I'm getting this from. So let's say there were an additional sentence in the analysis that said, we understand that this gives Trejos Hermanos more compensation than it would have received had the contract been performed. But I think that's justified under the circumstances because Verizon acted badly. Then we wouldn't recognize the extra damages, right? Because then it would clearly be punitive. I'm not sure about that, Your Honor. I mean, part of the rationale here was this was a willful breach. And willful breaches give rise to consequential damages in Costa Rican law. And I'm not sure that would rise to the level of being punitive in nature. Again, none of these particular issues were even briefed by Verizon. It clearly forfeited that argument by not appealing it. Now, if I may just briefly, I know I'm way over time, respond to the integrity points that counsel made because I do want to address this recusal ruling. So what about that? So was there an order explaining the reversal of the recusal order? There absolutely was a ruling. We have a copy here. And Mr. Dupree never asked me to see it. I assume it's part of the court record. I assume that's where he received it. I don't know why counsel didn't see it. Now, the reason it's not in the record is because Verizon never. It looks like a court opinion. It has a caption and everything. I believe so, Your Honor. Yes. Whatever they have in Costa Rica. Yes. Yes, Your Honor. Verizon never made this. Why don't you give a copy to Mr. Dupree? I will hand him a copy right now. Verizon never made this argument below. It is not in its Rule 56D declaration. It is not in its Rule 56D briefing. It is not in its opposition to our summary judgment motion. It is one line in a declaration that they attached to their opposition that they didn't point the district court to. This argument is forfeited, and that's why it's not in the record. But let me tell you what is in the record. What is in the record is the Supreme Court of Justices' denial of Verizon's motion for reconsideration. It's at JA-925. And in that motion, Verizon, again, after the recusal motion had been denied by the investigating judge, again accused these judges of being biased. And they unequivocally and emphatically rejected those accusations, even going so far as to chastise Verizon for engaging in disrespectful epithets and ad hominem fallacies. That is at JA-933. These accusations of bias have no basis. Judge Abrams looked at them at the 56D stage and concluded that it was a phishing expedition, speculative accusations of monkey business, and Judge Rashan did the same at the merit stage. These kinds of relationships between judges and lawyers are commonplace in our legal system. Clerks appear before judges. Relatives appear before courts involving their former judges. These are commonplace. It is no reason to accuse these judges of being biased, and none of Verizon's other arguments that are just quibbles with the outcome of the case give rise to any sort of substantial doubt about bias. Okay, thank you very much. Thank you. Ms. Zaharia, we'll turn back to Mr. Dupree on rebuttal. Thank you, Your Honor. Just a few points. The first is the one thing we know from Article 53 is that it is exceedingly protective and respectful of agreements to arbitrate. I think that's common ground. To Judge Chin's point, the statute as a whole definitely reflects a spirit of comedy, but it balances the interest in comedy with protecting the rights of defendants. And one way that the authors of the CPLR protected that was by saying, we, United States courts, will enforce and respect agreements to arbitrate. And so for that reason, the district court's rationale – Okay, that's fair enough, but what about the argument that, okay, you signed a contract that had an arbitration clause but you chose Costa Rican law to govern the contract and apparently under Costa Rican law, when a plaintiff sues a government agency, everything in the case is decided on the merits without regard to an arbitration clause? But I think the proper analysis under B-5 is simply, as the text says, whether or not the parties, the proceedings that happened were contrary to what the parties agreed to. And here, the parties indisputably – Well, that's true, but, you know, I was just making an argument to Ms. Zaharia that we should read the text in light of the legal background principles. And so it's true there literally is an agreement to arbitrate, but you know that sometimes the law operates in a way that it becomes unenforceable or inapplicable, right? That's not a surprising result. It can't possibly be that the CPLR says it's illegitimate for any foreign court ever to decline to enforce an arbitration clause. The only time defendants would need the protections of subsection B-5 is when they find themselves in this precise situation where they sign an arbitration agreement that for whatever reason, reasons of foreign law, the foreign court declines to enforce. And if the – I mean, I would think you could make, you know, a more precise argument, which is just here it seems like they're discounting it for arbitrary reasons. It's not that in every case where there's an arbitration clause that it must necessarily be enforced. I completely agree with that, Your Honor. I think that the questions that Your Honor was asking, and I thought the colloquy between my friend and Your Honor I thought was illuminating because those are precisely the types of kind of tire-kicking questions that a district court should have asked but didn't. Namely, is there a principle of Costa Rican law here at stake? Was that principle of Costa Rican law fairly and neutrally applied in this case? Again, we're not asking for de novo review or second guessing. We're just simply asking, make sure that this decision was not arbitrary. Make sure it was not contrary to clearly established law. At a minimum, we created a dispute on this when we put in our expert report. The district court could have conducted a hearing under 44 – Federal Rule of Civil Procedure 44.1, which says if there is questions about foreign law, you hold a hearing, you consider all the facts and materials, and then the district court, again, giving due deference to the foreign court's judgments under animal science, decides what the law is. That didn't happen here either. I agree with that argument. I guess I was asking Ms. Zahari a lot of questions about the damages too, and she pointed out reasonably that it doesn't seem like you contested the damages calculation in Costa Rica and didn't appeal the damages question to our court. Is that right? Well, let's see. With regard to appealing to this court, I would direct the panel to page 39 of our opening brief. That's the point where, in the context of our due process argument, we said that, number one, this $106 million judgment vastly exceeded, to Your Honor's questions, the value of the contract had it been performed, namely about $8 million. We said explicitly that this award was arbitrary. We said it was punitive and that it was irrational. So I think we did preserve that precise argument that the discrepancy between the award and the actual damages caused by the breach was so large as to render this award arbitrary, irrational, and violating due process. To Your Honor's questions— Is that a ground for denying recognition to the award? Or, you know, the CPLR says you recognize it insofar as it's not punitive. Maybe the district court's required to recognize it insofar as it awards compensatory damages but not punitive damages. Is that something the district court could do? Well, I think the right answer here, actually, is that just the amount of the award renders it irrational. Typically, if a federal court finds that a jury has made an irrational award, the result is you vacate and remand for reconsideration rather than say, well, we'll try to figure out what portion of it was rational and prune it out and remit. So I think the better course would simply have been to say this award was arbitrary, irrational, contrary to Costa Rican law and must be vacated. But at a minimum, I suppose, you know, could they have reduced it to the expectation damages, you know, or the performance value of $8 million? That would have been more rational. Yeah, that would have been a better approach. But let me also address one other point on the arbitration issue, Your Honor. We were talking about B-5, which, of course, is the provision that says were the proceedings contrary to an arbitration agreement. One other provision that's at issue here is B-3. That's the one that says a ground for nonrecognition is if the award is contrary to a U.S. public policy. Of course, we all know well-settled arbitration enforcement is strong U.S. public policy, one of the strongest. And so that provides an additional ground for nonrecognition that I don't think implicates some of the questions that Your Honor was talking about, about what does the word parties mean in B-5. It's also an issue where there's absolutely no ground for arguing that a comedy-based deference is appropriate. It cannot be the case that the question whether a foreign judgment is contrary to United States public policy is a question of Costa Rican law that is committed to the Costa Rica Supreme Court for decision. Clearly and indisputably, that is a question of United States law that must be decided by a United States court. This is not a difficult case in that regard. There is an arbitration agreement. We all agree there's no dispute that it was signed. There's no dispute that the parties intended to have these precise breach of contract disputes arbitrated. And there's no question that the proceedings went ahead despite that arbitration agreement. It was clearly contrary to the arbitration agreement. Your Honor's point about there's a little bit of jujitsu going on, where on one hand, the Costa Rican courts are saying you're a party to the contract and liable for its breach. And on the other hand, they're saying you're not a party to the contract, so you can't enforce arbitration. There's no rational system of justice in the known universe that would endorse such an anomalous, self-contradictory result. The opposing counsel thinks that Costa Rica is such a system, so what about the principle that whenever there is a government agency whose liability is at stake, the administrative court takes jurisdiction of the whole case and decides everything on the merits without regard to the arbitration clause. Is that a principle that we should accept from Costa Rican law? It is not a principle that this court should endorse. For one thing, that principle is directly at odds with United States public policy that arbitration agreements are enforced, period. And the fact that you fraudulently join a government agency who's promptly dismissed from the case with no liability cannot defeat an arbitration clause. If that application of kind of an unusual and peculiar rule of form— I have two questions. So one is, is the argument that even if that is the principle of Costa Rican law, it should lead to the non-recognition of the judgment, or is the argument, well, actually, that's not what Costa Rican law requires, and so this case actually is an outlier, it isn't consistent with Costa Rican law, or do you make both arguments? Well, I think we make both arguments. At a minimum, it is not a fair application of Costa Rican law. That's the point that we made in our expert report from one of the leading law professors in the entire nation, an expert in civil law who's taught this for more than 20 years. He says, that's not Costa Rican law. That's not fair. Again, would our expert's opinion necessarily carry the day? Maybe, maybe not. I think it does. But the point is the district court didn't engage that on the merits. The district court simply said, well, the Costa Rican Supreme Court has spoken. That's enough. Didn't ask, is this arbitrary? Is there a principle of Costa Rican law lurking under here? We didn't get any of that. I think we have that argument. Thank you very much, Mr. Dupree. The case is submitted. Thank you.